DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@holdenlegal.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@holdenlegal.com
W. Forrest Fischer, Esq. (ISB. No. 10009)
wfischer@holdenlegal.com
HOLDEN KIDWELL HAHN & CRAPO, P.L.L.C.
P.O. Box 50130
1000 Riverwalk Drive, Suite 200
Idaho Falls, ID 83405
Telephone: (208) 523-0620
Facsimile: (208) 523-9518

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HANNAH SMITH, AMY FEIK, and SIERRA DIVINE, <br><br> Plaintiffs, <br><br> v. <br><br> BEST BUY STORES, L.P., a Virginia limited partnership, <br><br> Defendant. | Case No. _____ <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> Filing Fee: $400.00 |

Plaintiffs Hannah Smith, Amy Feik, and Sierra Divine (collectively as "Plaintiffs"), by and through their counsel of record, Holden, Kidwell, Hahn & Crapo, P.L.L.C., and as a cause of action against Best Buy Stores, L.P., a Virginia limited partnership, complains and alleges as follows:

**JURISDICTION AND VENUE**

1. This action is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.*; 42 U.S.C. § 1981(a) *et seq.*; the Idaho Human Rights Act, Idaho Code §§ 18-7301, 67-5901 *et seq.*; and the common law of the State of Idaho.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1343, and 1367; and 42 U.S.C. § 2000e.

3. Venue in this action properly lies in the U.S. District Court for the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose, and the parties reside in this judicial district; and venue also properly lies in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices were committed in this judicial district.

## PARTIES

4. Plaintiffs reallege and incorporate by reference paragraphs 1 through 3 as though fully set forth herein.

5. Plaintiff Hannah Smith (individually as "Smith"), is a female citizen and resident of the United States of America, who is, and at all times relevant to these claims, was, a resident of Bonneville County, Idaho.

6. Plaintiff Amy Feik (individually as "Feik"), is a female citizen and resident of the United States of America, who is, and at all times relevant to these claims, was, a resident of Bonneville County, Idaho.

7. Plaintiff Sierra Divine (individually as "Divine"), is a female citizen and resident of the United States of America, who is, and at all times relevant to these claims, was, a resident of Jefferson County, Idaho.

8. Defendant Best Buy Stores L.P., is a Virginia limited partnership, with its principal place of business in Alexandria, which is located in Virginia (hereinafter as "Best Buy"). Best Buy Operates a retail store located in Idaho Falls, Idaho.

2 – COMPLAINT AND DEMAND FOR JURY TRIAL

9. At all times relevant to this Complaint, Best Buy regularly employed fifteen or more persons whose services were performed in the State of Idaho and was engaged in an industry affecting commerce. Consequently, Best Buy's conduct is properly regulated by Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Idaho Human Rights Act, Idaho Code § 67-5901 *et seq.*

## FACTS COMMON TO PLAINTIFF SMITH

10. Plaintiffs reallege and incorporate by reference paragraphs 1 through 9 as though fully set forth herein.

11. On or about October 19, 2013, Smith was hired by Best Buy to work in Best Buy's Idaho Falls store.

12. At all times she was employed by Best Buy, Smith performed her job duties in a satisfactory manner.

13. Beginning in June of 2014, Smith's supervisor, Todd Childs ("Childs"), began sexually harassing her.

14. Childs' sexual harassment included, among other things, explicitly describing how he would perform oral sex on Smith.

15. In addition to overt sexual comments, Childs also used sexual innuendoes and double entendres when speaking with Smith.  In one instance, Childs approached Smith with a jar of peanuts and suggestively asked her if she wanted to try his "nuts."

16. Following Childs' numerous instances of sexual harassment, Smith complained to her general manager, Jason Strawn ("Strawn"),  and anonymously filed a report with Best Buy's Human Resources Department.

3   –    COMPLAINT AND DEMAND FOR JURY TRIAL

17.    Despite her complaints, Smith observed that neither Strawn nor Best Buy disciplined Childs for his conduct or required Childs to stop his conduct.

18.    In July 2014, Childs began targeting Smith in retaliation for her complaints by, among other things, formally criticizing her job performance in performance reviews and alleging that she had a "bad attitude."

19.    In August 2014, Childs threatened to fire Smith, stating that she was a "bad worker" and had a "bad attitude."  Shortly thereafter, Smith complained again to Strawn, who instructed her that she should confront Childs about his actions.  Strawn and Smith then proceeded to meet with Childs, whereupon Childs proceeded to yell at and berate Smith. Strawn did nothing to stop Childs' actions

20.    For the remainder of 2014, Childs' aggressive behavior towards Smith continued to increase, creating a hostile work environment and materially affecting Smith's work.

21.    On one occasion in 2014, Childs arbitrarily sent Smith home early for "having a bad attitude at work," depriving her of income for the day.

22.    In or about March 2015, Childs was promoted to be Smith's immediate supervisor, despite Smith's reports of sexual harassment against him.  As Smith's direct supervisor, Childs was responsible for arranging and organizing Smith's work schedule and hours.  When it came time for Childs to set Smith's work schedule for the first time, Childs cut her work hours by more than a 26% - from an average of 30 hours per week to only 22 hours per week.

23.    On or about March 7, 2015, Smith approached Strawn to discuss the drastic reduction of her work hours.  Smith also expressed her discomfort in working directly under Childs due to his prior sexual harassment and his hostility towards her.  However, instead of addressing

her concerns, Strawn told Smith that she had to decide whether or not she wanted to work at Best Buy.

24.    On or about March 21, 2015, Smith approached Strawn again and informed him that her hours still had not changed.  Smith also renewed her request that Strawn to look into her sexual harassment claims against Childs and his hostility towards her.  Strawn refused, stating that Childs' actions were not discrimination, but only a lack of communication.

25.    Following Smith's meeting with Strawn on March 21st, Childs reduced Smith's hours even further, to only 14 hours per week.

26.    On or about March 29, 2015, Childs reduced Smith's hours again, scheduling her for only 6 hours per week.

27.    In or about March 2015, Smith contacted Best Buy's Human Resources Department and reported Childs' sexual harassment and retaliatory actions towards her.  After taking notes on Smith's report, the Best Buy Human Resources representative stated that Smith would be contacted in about five business days by a caseworker who would investigate her report.

28.    Following her report, Smith was left a voice message by Best Buy's Human Resources Department for her to contact them.  However, Smith was unable to contact the caseworker despite multiple attempts.  Best Buy never made another attempt to contact her after its initial voice mail.

29.    On or about April 29, 2015, Smith arrived at work to find that Childs did not schedule her to work at all the following week.  Smith immediately requested a meeting with Strawn, wherein she showed him that she was the only employee not being scheduled to work.

30.    Smith also asked Strawn whether or not he had spoken with other employees Smith previously identified as having witnessed Childs' harassment.  Strawn responded "I don't

need to" because he had spoken which Childs who denied the harassment, leading him to conclude "there wasn't anything more to follow up on."

31. Given Strawn's refusal to remedy Childs' sexual harassment and hostile actions towards Smith, coupled with the reduction of her work hours to zero, Smith had no choice but to seek other employment. Smith gave Strawn her notice that she was leaving because she could not afford to be without work and was constructively discharged.

32. On or about December 8, 2015, Smith filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Idaho Human Rights Commission.

33. On or about April 6, 2016. Smith received her Notice of Right to Sue letter from the EEOC. Smith has exhausted her administrative remedies.

## FACTS COMMON TO PLAINTIFF DIVINE

34. Plaintiffs reallege and incorporate by reference paragraphs 1 through 33 as though fully set forth herein.

35. On or about June 30, 2013, Divine was hired by Best Buy to work in Best Buy's Idaho Falls store.

36. At all times she was employed by Best Buy, Divine performed her job duties in a satisfactory manner.

37. After Divine was hired, Childs began sexually harassing Divine by, among other things, nicknaming her "Chesty" in reference to her breast size. Childs referred to Divine as "Chesty" on numerous occasions, both to Divine's face and when referring to Divine in conversations with other employees.

38. Childs' sexual harassment became more explicit when Divine was promoted to work in Best Buy's "Geek Squad" near the end of 2014, with Childs as her direct supervisor.

39. As part of working on the Geek Squad, Divine was required to wear a white button up shirt as part of her work uniform. Upon seeing Divine in her Geek Squad uniform, Childs stated: "Oh, seeing you in that white shirt gets me so hard I just want to pour a bucket of water all over you, Chesty."

40. Childs sexually harassed Divine at other times, stating once that Divine "looked just like his hippie wife when she didn't wear makeup" and that he could not keep his hands off his wife when she looked like that. He continued to state that he would show Divine "exactly what he meant" and that the way she looked made him "hard."

41. When Divine did not reciprocate Childs' sexual comments, he reassigned her to another department in Best Buy and threatened that if she ever gave him a reason to, he would fire her with no questions asked.

42. Sometime after being reassigned, Divine and Childs got into a verbal disagreement. Childs escalated the disagreement by pressing his chest against Divine and yelling at her that she had a "bad attitude." Divine responded by telling Childs to "get the hell out of [my] face," whereupon Childs yelled "Get the f*** out of my store little bitch!"

43. Immediately after Childs' verbal abuse, Divine threw her headset down on her desk and reported to Strawn what happened. Instead of directly addressing the problem, Strawn asked if there was anything else that could have led up to her confrontation with Childs, implying that Divine was at fault. Divine informed Strawn of Childs' sexual comments towards her and Childs' hostile attitude towards her. Strawn told Divine that he would submit something to Human Resources and sent Divine home for the rest of the day.

44.    While at home, Strawn called Divine on the phone twice, appearing to follow up on her claims about Childs' sexual harassment.  However, instead of discussing Childs' actions, Strawn accused her of misbehavior at work, ranging from completely false allegations of drug use at work to absenteeism during her shift.  During their telephone conversation, Strawn never asked Divine about Childs' sexual harassment or his aggressive and abusive behavior.

45.    Following his conversations with Divine, Strawn deemed the issue resolved and proceeded to discipline Divine with a write up for throwing her headset and using profanity at the work place.  Strawn stated that he would "talk to [Childs] about his behavior," but to Divine's knowledge, Strawn never followed up.

46.    After her altercation with Childs and her reporting of Childs' sexual harassment, Divine's work schedule was reduced.  At the same time, other management at Best Buy began to question Divine about alleged reports of her being under the influence of drugs while at work.  In order to confront these allegations, Divine offered to take a drug test.  However her offer was rebuffed by management.

47.    During 2015, Divine contacted Best Buy's Human Resources department several times to report Childs' offensive behavior.  However, Best Buy took no action against Childs.

48.    As time went on, Divine's working conditions worsened.  First, she was continually scheduled on those days that she had explicitly identified previously as times when she was unavailable to work due to other commitments.  Second, she observed on numerous occasions that her male co-workers were receiving preferential treatment over her.  And third, even after she reported this disparate treatment and other workplace issues to management, nothing was done.

49. In October 2015, Divine had no choice but to leave because of Best Buy's refusal to address the situation. Divine was constructively discharged by Best Buy, due to Best Buy's failure to schedule Divine's work hour at times she could work, preferential treatment of more employees and failure to address the disparate treatment directed at Divine.

50. On or about December 4, 2015, Divine filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Idaho Human Rights Commission.

51. On or about April 6, 2016. Divine received her Notice of Right to Sue letter from the EEOC. Divine has exhausted her administrative remedies.

## FACTS COMMON TO PLAINTIFF FEIK

52. Plaintiffs reallege and incorporate by reference paragraphs 1 through 51 as though fully set forth herein.

53. On or about November 16, 2013, Feik was hired by Best Buy to work at Best Buy's Idaho Falls store.

54. At all times she was employed by Best Buy, Feik performed her job duties in a satisfactory manner.

55. In or about June 2014, Feik's roommate, Smith, confided in Feik that Childs was sexually harassing her at work. After Smith formally complained about Childs' sexual harassment, Childs began to treat Feik differently, in retaliation to Smith's complaint. Childs appeared to be angry with Feik and began reporting her for having a "bad attitude" every week. However, Childs never approached Feik about his concerns regarding her performance.

56. Around the same time, Feik also observed Childs making inappropriate sexual comments to her and other employees in the store. On one instance, during a company-sponsored

barbeque, Childs was tasked with cooking hot dogs for the employees. Upon seeing Feik eating one of the hot dogs, Childs commented, in obvious innuendo, that "his wiener was in [her] mouth," and that "his wiener was juicy in [her] mouth." Childs then proceeded to say the same thing to another female employee at the barbeque.

57. Another time, Childs approached Feik with a jar of peanuts and said "Would you like my nuts in your mouth?" after which he handed her the jar and said "Take my nuts home and think about it."

58. Feik reported Childs' sexual harassment to Strawn. However, Strawn dismissed Feik's report stating that it was just Childs' type of humor.

59. In or about July 2014, Childs pulled Feik into the manager's office about ten minutes after her shift had started. Childs then proceeded to yell at Feik for allegedly disrespecting him and having a bad attitude. Feik responded that she didn't know what he was talking about. Nevertheless, Feik attempted to placate Childs by promising to have a better attitude at work because she was afraid of being fired. When Feik attempted to leave the office, Childs cut her off, blocking the office exit in an aggressive pose. Childs proceeded to threaten Feik by stating: "Don't you dare call HR on me."

60. In or about October 2014, Feik requested a raise from Strawn based on the fact that she had been given more responsibility at work. Strawn refused, stating that she was not doing enough for a raise. However, Feik knew that many of her male co-workers were doing less work and had less responsibility than her and yet were still paid more.

61. In or about June 2015, Feik was summoned to Strawn's office to watch in-store surveillance footage of herself. Strawn used the footage to critique Feik that she was not walking "urgently" enough. Despite Feik meeting or exceeding all of her sales goals, Strawn

informed her that she had a bad attitude. Feik disagreed, stating that she had numerous positive feedback comments from her customers, had been nominated for employee of the month, and had never received a single customer complaint. Strawn dismissed Feik's reasoning as excuses.

62. In or about June 2015, Feik was the only full-time associate in her department. Accordingly she was asked by her direct supervisor, Justin Naifeh ("Naifeh"), if she was interested in attending a corporate training in Denver, Colorado, and she enthusiastically said, "Yes." However, that night, the other managers, including Childs and Strawn, selected a male part-time associate who had only been hired three months prior, Mike Lord ("Lord"), to go on the trip to Colorado instead. When Feik was informed that she could no longer attend the training, she expressed her frustration to Naifeh. Naifeh explained Feik would have an opportunity to attend the next training and that the managers thought Lord "could do more" with the training than Feik could.

63. Between June and October 2015, Feik applied for two open positions within her store, but was not selected despite her experience and excellent performance.

64. Despite her best efforts, Feik felt that her managers and supervisors were actively seeking out excuses not to promote her due to her complaints against Childs and for being female.

65. In or about October 2015, another corporate training event was held, but Feik was passed over again in favor of another new full-time male associate who had only been hired about one week prior. Feik expressed her frustration to Naifeh for a second time about not being selected for the training event and for her applications being rejected. Naifeh responded that she should not apply to any future positions that were opened because she would not get them. Feik then asked if she had any other options besides staying at her current position and

knowing she would never advance or looking for another job.  Naifeh replied by shrugging his shoulders and saying, "I guess none."

66.   On or about October 29, 2015, Feik overheard Naifeh and District Manager Bryan Dee ("Dee") talking in Naifeh's office.  The door to Naifeh's office was open and within clear ear shot of the "employee prep station" where Feik and four other Best Buy employees congregated to review their selling information for the day.  Feik and her fellow employees overheard Dee instructing Naifeh to work on improving his employees instead of threatening to fire them.  Dee then pointed to a list and stated, "for example, none of these people should be fired."  Naifeh responded by pointing the to the list and stating "well, she should" to which Dee responded, "Okay, so besides maybe [Feik], no one else should be fired."  After the other employees heard this, news of Feik being potentially fired spread quickly to the other employees at Best Buy.  By the end of the day, Feik was receiving texts from her co-workers who were off that day and from people who did not work at Best Buy asking her why she was getting fired.  Feik felt extremely humiliated that Naifeh would make such a statement knowing numerous employees could overhear.

67.   On or about October 29, 2015, Feik sent an email to Best Buy District Manager, Shane Peterman ("Peterman"), reporting that she was being discriminated against and had been passed over numerous times for training and promotions, her concerns about overhearing Naifeh tell Dee that she needed to be fired, as well as her exasperation with the fact that she had made numerous reports to HR and local management about the work environment and nothing was ever done.

68.   The next day, October 30, 2016, Naifeh and Strawn called Feik into a meeting in order to discuss what she heard the day before.  Within this meeting, Naifeh stated that, while he did

not "have a plan to fire [Feik]" she was nevertheless "on his radar." Naifeh chastised Feik for using too much of her paid time off and for not meeting her numbers. Feik responded that it was difficult to meet her numbers when she was never scheduled on high retail days and that she needed to take that time for family emergencies and other last-minute obligations. However Naifeh replied that her reasons were a "cop out."

69. Also during her meeting with Naifeh and Strawn, Feik was berated for not walking "urgently." Naifeh and Strawn criticized Feik on her "mannerisms" and for "the way [she] walked." When Feik pointed out her positive sales metrics, Naifeh and Strawn stated that they did not care what her numbers were, only that she wasn't "urgent."

70. In November 2015, Feik was issued a "final warning" from Naifeh and Strawn for not being urgent in helping a customer on a particular instance. When Feik responded that she was helping her shift leader with something he requested, Naifeh and Strawn dismissed her reasoning as an excuse and that she "shouldn't let her guard down" at any time.

71. Again, Feik stated that management was actively seeking to push her to quit by writing her up for innocuous things. Based on disparate treatment and Best Buy's refusal to address it, Feik had no option but to leave her employment. Accordingly, Feik was constructively discharged in November 2015.

72. On or about December 8, 2015, Feik filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Idaho Human Rights Commission.

73. On or about April 6, 2016. Feik received her Notice of Right to Sue letter from the EEOC. Feik has exhausted her administrative remedies.

**COUNT ONE**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(Hostile Work Environment)**

74.    Plaintiffs reallege and incorporate by reference their respective paragraphs 1 through 73 as though fully set forth herein.

75.    Best Buy violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981(a), *et seq.*, by subjecting Plaintiffs to a hostile work environment.

76.    Plaintiffs were subjected to numerous sexual comments by their co-workers and supervisors.

77.    Plaintiffs were also subjected to demeaning and offensive comments regarding their gender.

78.    The sexual comments and demeaning and offensive comments regarding Plaintiffs' gender created a hostile work environment for Plaintiffs.

79.    Plaintiffs' co-workers' and supervisors' conduct and comments toward Plaintiffs were unwelcome and discouraged by Plaintiffs.

80.    Plaintiffs' co-workers' and supervisors' conduct was sufficiently severe and pervasive to alter the terms and condition of Plaintiffs' employment and created a sexually abusive, discriminatory, and hostile work environment.

81.    Plaintiffs individually perceived the working environment to be abusive and hostile and/or offensive.

82.    A reasonable person in each of the Plaintiffs' respective situations would have perceived the working environment to be abusive and hostile and/or offensive.

83.    Plaintiffs sustained several adverse tangible employment actions, including but not limited to:

    a.    Constructive discharge;

    b.    Unfavorable work assignments and scheduling;

    c.      Lower performance review ratings; and

    d.      Abusive and harsh treatment.

84.    Based on information and belief, Childs was never disciplined for his conduct towards Plaintiffs in any way. Further, based on information and belief, Strawn was never disciplined for his conduct and failure to act on the reports of Childs' conduct.  Finally, based on information and belief, no other supervisors or co-workers of Plaintiffs were ever disciplined as a result of their behavior.

85.    As a direct and proximate result of Best Buy's actions and/or failure to act, Plaintiffs have each suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation due to the hostile work environment that they experienced. Further, Plaintiffs have each suffered and will continue to suffer loss of earnings and other employment benefits and job opportunities. Plaintiffs are thereby entitled to general and compensatory damages, such amount to be determine at trial, as well as any other equitable remedies available to them respectively.

86.    Best Buy's conduct was malicious and oppressive, and done with reckless disregard for Plaintiffs' federally protected rights, for which Plaintiffs are individually entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## COUNT TWO
## VIOLATION OF THE IDAHO HUMAN RIGHTS ACT
### (Hostile Work Environment)

87.    Plaintiffs realleges and incorporate by reference their respective paragraphs 1 through 86 as though fully set forth herein.

88.    Best Buy violated the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*, by subjecting Plaintiffs to a hostile work environment.

89.    As a direct and proximate result of Best Buy's actions and/or failure to act, Plaintiffs have each suffered and will continue to suffer emotional distress, consisting of outrage, shock, and humiliation, based upon the hostile work environment they respectively experienced. Further, Plaintiffs suffered and will continue to suffer loss of earnings and other employment benefits and job opportunities. Plaintiffs are thereby each entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to them respectively.

90.    Best Buy's conduct was malicious and oppressive, and done with reckless disregard for Plaintiffs' rights, for which Plaintiff is entitled to punitive damages pursuant to Idaho Code § 67-5908.

**COUNT THREE**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(Gender Discrimination)**

91.    Plaintiffs realleges and incorporate by reference paragraphs 1 through 90 as though fully set forth herein.

92.    Plaintiffs are each female and therefore belong to a protected class under Title VII of the Civil Rights Act of 1964.

93.    Plaintiffs at all times performed their jobs satisfactorily.

94.    Plaintiffs suffered adverse employment actions when Best Buy, among other things:

    a.    Allowed Plaintiffs to be subjected to abusive comments and actions based upon their gender;

    b.    Failed to investigate their respective complaints in a timely manner;

    c.    Failed to provide them with job opportunities given to similarly-situated male employees;

d.     Failed to keep their complaints confidential and/or investigate the concerns;

e.     Failed to prevent or stop retaliation against Plaintiffs; and

f.     Constructively discharged Plaintiffs.

95.   Plaintiffs were each treated differently than their similarly-situated male employees.

96.   Best Buy subjected Plaintiffs to gender discrimination.

97.   As a direct and proximate result of Best Buy's actions and/or failure to act, Plaintiffs have suffered and will continued to suffer emotional distress, consisting of outrage, shock, and humiliation, based upon the gender discrimination they experienced respectively. Further, Plaintiffs have suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiffs are thereby each entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to them respectively.

98.   Best Buy's conduct was malicious and oppressive, and done with reckless disregard for Plaintiffs' federally protected rights, for which they are each entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

**COUNT FOUR**
**VIOLATION OF THE IDAHO HUMAN RIGHTS ACT**
**(Gender Discrimination)**

99.   Plaintiffs  reallege and incorporate by reference paragraphs 1 through 98 as though fully set forth herein.

100.  Best Buy violated the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*, by subjecting Plaintiffs to gender discrimination.

101.  As a direct and proximate result of Best Buy's actions and/or failure to act, Plaintiffs have each suffered and will continue to suffer emotional distress, consisting of outrage, shock and

humiliation, based upon the gender discrimination they experienced. Further, Plaintiffs have suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiffs are thereby each entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to them respectively.

102.  Best Buy's conduct was malicious and oppressive, and done with reckless disregard for Plaintiffs' rights, for which Plaintiffs are each entitled to punitive damages pursuant to Idaho Code § 67-5908.

**COUNT FIVE**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(Retaliation)**

103.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 102 as though fully set forth herein.

104.  Plaintiffs each engaged in an activity protected by federal law by objecting to the discriminatory and hostile work environment created by Best Buy and reporting this conduct to multiple supervisors and Best Buy's Human Resources Department.

105.  Best Buy subjected Plaintiffs to adverse employment actions by failing to adequately investigate their respective complaints, failing to take sufficient action to stop or remedy the discriminatory behavior complained of, disseminating confidential information to co-workers regarding Plaintiffs' complaints, failing to take any action to stop retaliatory behavior against Plaintiffs, and accusing Plaintiffs of poor work performance, including but not limited to failing to walk "urgently" enough and/or having "bad attitudes."

106.  Such adverse employment actions constitute retaliation against Plaintiffs for objecting to and reporting harassment, discrimination, and hostile work environment created by Best Buy.

107.    As a result of Best Buy's retaliatory actions against Plaintiffs, Plaintiffs were each constructively discharged by Best Buy.

108.    As a direct and proximate result of Best Buy's actions and/or failure to act, Plaintiffs have each suffered and will continue to suffer emotional distress, consisting of outrage, shock, and humiliation, based upon the retaliation they experienced respectively. Further, Plaintiffs have each suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiffs are each thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to them.

109.    Best Buy's conduct was malicious and oppressive, and done with a reckless disregard for Plaintiffs' federally protected rights, for which Plaintiffs are each entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## COUNT SIX
## VIOLATION OF THE IDAHO HUMAN RIGHTS ACT
### (Retaliation)

110.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 109 as though fully set forth herein.

111.    Plaintiffs engaged in an activity protected by Idaho law by objecting to the sexual harassment, discrimination, and hostile work environment created by Best Buy and reporting this conduct to multiple supervisors and Best Buy's Human Resources Department.

112.    Best Buy subjected Plaintiffs to an adverse employment action by failing to adequately investigate Plaintiffs' respective complaints, failing to take sufficient action to stop or remedy the discriminatory behavior complained of, disseminating confidential information to co-workers regarding Plaintiffs' complaints, failing to take any action to stop retaliatory

behavior against Plaintiffs individually, and accusing Plaintiffs of poor work performance, including but not limited to failing to walk "urgently" enough and/or having "bad attitudes."

113. Such adverse employment actions constitute retaliation against Plaintiffs for their respective actions for objecting to and reporting sexual harassment, discrimination, and hostile work environment created by Best Buy.

114. As a result of Best Buy's respective retaliatory actions against Plaintiffs, Plaintiffs were each constructively discharged.

115. As a direct and proximate result of Best Buy's actions and/or failure to act, Plaintiffs each have suffered and will continue to suffer emotional distress, consisting of outrage shock and humiliation based upon the retaliation they experienced respectively. Further, Plaintiffs have each suffered and will continue to suffer loss of earnings and other employment benefits and job opportunities. Plaintiffs are each thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to them respectively.

116. Best Buy's conduct was malicious and oppressive, and done with reckless disregard for Plaintiffs' rights for which Plaintiffs are each entitled to punitive damages pursuant to Idaho Code § 67-5908.

## COUNT SEVEN
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

117. Plaintiffs realleges and incorporate by reference paragraphs 1 through 116 as though fully set forth herein.

118. Best Buy was aware of an ongoing problem with Childs' harassment, intimidation, bullying, assault, and abuse, as well as the hostile environment at its store, during Plaintiffs' individual employment with Best Buy.

119.   Despite being fully aware of these problems and being fully aware that Plaintiffs were targets of these actions, members of Best Buy management did nothing to prevent or stop such conduct towards Plaintiffs.

120.   Best Buy's conduct was intentional and/or reckless.

121.   Best Buy's conduct was extreme and outrageous.

122.   Best Buy's conduct caused severe emotional distress to Plaintiffs, respectively.

123.   Best Buy knew or should have known that such conduct was highly likely to cause or result in severe emotional distress to Plaintiffs, individually.

124.   As a direct and proximate result of the conduct of Best Buy, Plaintiffs have each suffered serious emotional distress, as well as physical manifestations of such emotional distress, including anxiety, worry, headaches, nausea, weight gain, etc., all to Plaintiffs' individual general and special damages and detriment, in an amount to be proven at trial.

## COUNT EIGHT
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

125.   Plaintiffs realleges and incorporate by reference paragraphs 1 through 124 as though fully set forth herein.

126.   As an employer, Best Buy owed a duty to Plaintiffs recognized by law to ensure that Plaintiffs' working environment was free from harassment, intimidation, hostility, and abuse.

127.   Best Buy breached that duty to Plaintiffs by, among other things, putting Plaintiffs in situations where management physically assaulted and verbally abused them, and caused Plaintiffs to be subjected to harassment, intimidation, bullying, abuse, and a hostile work environment.

128.   Best Buy's conduct caused severe emotional distress to Plaintiffs, respectively.

129.   As a direct and proximate result of the conduct of Best Buy, Plaintiffs have each suffered serious emotional distress, as well as physical manifestations of such emotional distress, including anxiety, worry, headaches, nausea, weight gain, etc., all to Plaintiffs' individual general and special damages and detriment, in an amount to be proven at trial.

## ATTORNEY'S FEES

130.   As a further direct and proximate result of Best Buy's actions and/or failure to act, Plaintiffs have been compelled to retain the services of counsel, and have incurred and will continue to incur costs and attorney's fees. Plaintiffs are entitled to attorney's fees and costs incurred in pursuing this action pursuant to 42 U.S.C. § 1981(b), 42 U.S.C. § 2000e-5(k) and Idaho Code §§ 12-120 and 12-121.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury as to all issues triable to a jury in this action.

## PRAYER FOR RELIEF

Plaintiffs each respectively seek the judgment of the Court against Best Buy as follows:

1.   For general and compensatory damages, and all other statutorily available damages, in an amount to be proven at trial;

2.   For an award of punitive damages;

3.   For statutorily available costs and attorney's fees;

4.   For prejudgment interest on all amounts claimed; and

5.   For such other and further relief as the Court deems just and proper.

DATED this 30th day June, 2016.        /s/ _____

DeAnne Casperson, Esq.
Holden, Kidwell, Hahn & Crapo, P.L.L.C.

G:\WPDATA\DC\18529 Smith, et al\Pleadings\Complaint V. 5.wpd:dg